IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

L.A.D., INC.,                    )
                                 )
     Plaintiff,                  )    No. 4:12-cv-00164-RAW
                                 )
vs.                              )
                                 )    REPORT AND RECOMMENDATION
R & S XPRESS, LTD., LINDA        )    ON DEFENDANT FDIC-R'S
CORIGLIANO, ANDREW CORIGLIANO,)       MOTION FOR PARTIAL SUMMARY
DOMINIC CORIGLIANO, KEVIN        )    JUDGMENT
GOETZL, and FDIC AS RECEIVER     )
FOR POLK COUNTY BANK,            )
                                 )
     Defendants.                 )

     The above resisted motion is before the Court following hearing. Defendant FDIC as Receiver for Polk County Bank ("FDIC-R") requests a grant of summary judgment on Count I of Plaintiff's Amended Petition [4-1] entitled "Petition to Quiet Title," and FDIC-R's affirmative defense of bona fide purchaser without notice. Alternatively, FDIC-R seeks summary judgment on its Counterclaim I for an equitable mortgage or equitable lien. If the Court grants summary judgment on the quiet title claim, FDIC-R also moves for summary judgment on its Counterclaim II for common law attorney fees. Plaintiff resists on all grounds.

     This action was initially filed in the Iowa District Court in and for Polk County on November 15, 2007. After about four years and lengthy proceedings in that court, the defendant Polk County Bank failed and the FDIC became its receiver. On

1

April 20, 2012 the FDIC-R removed the case to this Court as permitted by federal law. 12 U.S.C. § 1819(b)(2)(B). With the FDIC-R involved, the case is deemed to arise under the laws of the United States for jurisdictional purposes. *Id.* § 1819(b)(2)(A); 28 U.S.C. § 1441(b). The Court has subject matter jurisdiction of the quiet title claim and supplemental jurisdiction of all others. 28 U.S.C. §§ 1331; 1367(a).

In addition to the quiet title claim, the removed Amended Petition includes seven counts for actual and punitive damages against the other five defendants under various state law theories. The FDIC-R is a party only on the quiet title claim. Though captioned a motion for "partial summary judgment," the FDIC-R's motion seeks a dispositive ruling on the claim against it as well as its counterclaims.

Though they appeared in the Iowa District Court, none of the other defendants have appeared or participated in proceedings in this Court. A review of the state court record reveals that at one time or another all filed for bankruptcy. As a result the state court stayed all proceedings. Relief from the bankruptcy stay was obtained by the bank, and on its motion the state court lifted its stay to allow the quiet title claim and the bank's foreclosure proceedings to go forward. The stay of the damages claims against the other defendants appears to

remain subject to the state court stay order and some of the defendants may have been discharged in bankruptcy proceedings.

Plaintiff and the FDIC-R consented to magistrate judge jurisdiction under 28 U.S.C. § 636(c)(1) and the matter was referred to the undersigned for all purposes. Though only the plaintiff and the FDIC-R have been active litigants in this Court, the other defendants are all parties to the quiet title claim and one, R & S Xpress, Ltd., is the record titleholder of the disputed property. None of the defendants are in default. Disposition of the quiet title claim will affect any rights the other defendants may have in the property. The other defendants did not consent to magistrate judge jurisdiction, and the consent of all parties is required. The order of reference has therefore been withdrawn. The pending summary judgment motion has been referred to the undersigned for report and recommendation as permitted by 28 U.S.C. § 636(b)(1)(A).

## I.

### FACTUAL BACKGROUND

Count I of the Amended Petition seeks a decree that title to Lot 5, Hatton Acres, Plat 2, now included in and forming a part of the City of Des Moines, Iowa ("the property") be quieted as "absolute title in fee simple" belonging to plaintiff. (Amend. Pet. [4-1] ¶ 60). Prior to the events at issue Peter Scaglione owned the property. In 1999, Mr. Scaglione

entered into a real estate installment contract with Jacob and Susan Mathew, husband and wife, to sell the property for $205,000 (the "Scaglione contract"). Philip Althomsons, a relative of the Mathews, was the guarantor. The purchase included a building with equipment for a restaurant. The contract was recorded with the Polk County Recorder.

While the Scaglione contract was still in effect, on May 7, 2001,[1] the Mathews entered into a real estate installment contract for the sale of the same property to the Corigliano family for $250,000 (the "Mathew contract").[2] (Def. App. [41-3] at 16). The members of the Corigliano family involved were Linda, Dominic (Don), and Andrew. Linda and Don are married, and they are Andrew's parents. The Coriglianos operated "Coriglianos' Pizza" on the property.[3] A promissory note and amortization schedule in the record indicates the monthly installment payments were $3,389.78 with the unpaid principal accruing interest at ten percent per annum. (Pl. App. [42-5] at 104-05).

The Coriglianos purchased the property through a corporation they established. The buyer on the Mathew contract

---

[1]  The contract was initially entered into on April 13, 2001 but had to be re-done because the legal description of the property was wrong. (*See* Pl. App. [42-3] at 1).
[2]  The sale of the real property appears to have been the principal part of a sales agreement with the Mathews in which the Coriglianos agreed to pay a total of $300,000 for the property and restaurant equipment.
[3]  It appears Andrew ran the restaurant with Don handling the business end. Linda had minimal involvement.

(and promissory note) was listed as "L.A.D., Inc." The contract was signed by Linda Corigliano as President of L.A.D., Inc., and Andrew Corigliano as Vice President of L.A.D., Inc. The Mathew contract was recorded with the Polk County Recorder.

On May 23, 2001 Linda Corigliano incorporated "L.A.D. Associates, Inc." The articles of incorporation filed with the Iowa Secretary of State identified Linda Corigliano as President and Andrew Corigliano as Vice President. (Def. App. [41-3] at 13-14). L.A.D. Associates, Inc. was administratively dissolved on August 5, 2002 for failure to file its 2002 biennial report. It has never been reinstated.

At hearing plaintiff's counsel contended that L.A.D., Inc. and L.A.D. Associates, Inc. were two separate corporations established by the Coriglianos, both of which had been dissolved. As evidence of this, counsel referred to Linda Corigliano's admission in response to a request for admission that she was President of an Iowa corporation registered as "L.A.D., Inc." (Pl. App. [42-4] at 42),[4] and testimony of plaintiff's president, Larry Miller, that he checked the Secretary of State's records and learned a L.A.D., Inc. had been incorporated but administratively dissolved. (*Id.* at 113). There is no indication in the summary judgment record that Mr. Miller

---

[4]   FDIC-R is not bound by any admission of a co-party. *See* 7 *Moore's Federal Practice and Procedure*, § 36.03[6] (3d ed. 2013).

identified who incorporated the corporation, when it was incorporated, or when it was dissolved.

Mrs. Corigliano testified she did not have much involvement in the family's business except her husband would have her sign things. She was not sure if she had ever heard of L.A.D. Associates, Inc. and testified she thought the business was L.A.D., Inc. (Def. App. [41-3] at 35-36). She is a poor historian. If, as Mr. Miller testified, the Secretary of State's records showed a L.A.D., Inc. existed and had been dissolved, there ought to have been some documentation of that fact. The existence of an Iowa corporation registered under the name L.A.D., Inc., when it was incorporated, and who by should be verifiable facts. Counsel conceded at the summary judgment hearing that no record has been located in the Iowa Secretary of State's office of the incorporation of a L.A.D., Inc. prior to Mr. Miller's incorporation of a corporation by that name in December 2004. (*See infra* at 10). Interestingly, the Secretary of State does have a record of a similarly named inactive Iowa corporation – LAD, Inc. (no periods after the letters) – incorporated in February 2003 which operated under the name "Compadres Margarita Bar and Grill." Its registered agent was a Diane Hughes. (Def. Supp. App. [45] at 146).

On this record it is highly probable that there was no L.A.D., Inc. at the time the Mathew contract was entered into

and that the Coriglianos formed L.A.D. Associates, Inc. to purchase the property. Don Corigliano has testified to the effect that the family referred to their corporation as L.A.D., Inc. as a shorthand reference. (Def. App. [41-3] at 43).[5]

By 2004 the installment payments on the Mathew contract had become delinquent, as well as the payment of property taxes. Don Corigliano has testified the situation unfolded as follows. He sought a loan from Iowa Mortgage and Consulting Services ("Iowa Mortgage") to refinance and pay the taxes. From his dealings with Iowa Mortgage he was under the impression the Coriglianos would be able to get the loan. Time was getting tight on the tax redemption period when, according to Mr. Corigliano, Iowa Mortgage told him there would not be enough time to complete the loan. Mr. Corigliano said he "threw an Italian temper tantrum" and threatened to sue. (Def. App. [41-3] at 46). At that point Iowa Mortgage owner Larry Miller offered to pay the delinquent property taxes.

Don Corigliano and Jacob Mathew met on December 6, 2004 to resolve the delinquent payment issues (the "dispute resolution meeting"). Mr. Miller and Mr. Althomsons were also present. An agreement was reached between Mr. Corigliano and Mr. Mathew. It was reduced to writing and signed on December 13. Jacob Mathew and Don Corigliano signed as parties to the

---

[5] Andrew Corigliano has testified the owner of Coriglianos' Pizza was L.A.D. Associates. (Def. App. [41-3] at 111).

agreement. Mr. Miller and Mr. Althomsons signed as witnesses. The agreement does not mention "L.A.D., Inc." or "L.A.D. Associates, Inc." but clearly concerns the property at issue. The agreement is entitled the "Dispute Reselution [sic] of Sales Agreement between Don Corigliano (for Linda Corigliano and Andrew Corigliano) and Jacob Mathew (for Susan Mathew and Jacob Mathew)" ("Dispute Agreement"). (Def. App. [41-3] at 62).

The Dispute Agreement memorializes the terms of an agreement whereby the parties "settled the dispute and finalized the sale of the property and business . . . ." There are several components to the agreement. First, it reduces the sales price to $200,000 to be confirmed by a separate "statement of contract" from the Mathews. The Mathews prepared and signed the statement of contract as required.

Second, to cure the tax and installment delinquencies the Dispute Agreement provides:

> Don agreed to pay a total of $51,364.00 to cover the property tax and mortgage payments due through December 2004. The payment shall be as follows:
>
> a. Larry Miller shall pay to Jacob Mathew in the amount of $42,794.00 for Don Coringliano [sic], upon receipt of the signed statement of contract and the New sales price agreement for $200,000.
> b. Don shall pay the due mortgage payment for December 2004 in the amount of $3390 to Jacob Mathew on or before December 15th, 2004.

> c. Don shall pay the balance of $5180 to
>    Jacob Mathew on a monthly installment
>    basis beginning December 30, 2004 in
>    the amount of $500.00 per month with
>    out any interest, until the total due
>    amount is paid off.
>    > Payment shall begin on Dec. 30,
>    > 2004 $500, January 30, 2005 $500,
>    > February 28, 2005 $500 . . . .
>    > etc. until September 30, $500, and
>    > the final payment shall be on
>    > October 20, 2005 for $180.00

(*Id.* at 62). It is undisputed that all of these payments were made. Mr. Miller borrowed the tax payment money through a corporation he owned (Quick Tax ERO, Inc.) and deposited it in a "L.A.D., Inc. d/b/a Corigliano's Pizza" account he opened at his bank. Mr. Miller paid the delinquent property taxes to the Mathews from the account. (See Pl. App. [42-4] at 40).

Third, the Dispute Agreement states: "It is expected to finance the total amount of $200,000 by Larry Miller within three months (by the end of February 2005) and relive [sic] Jacob Mathew and Susan Mathew from all legal binding to the ownership of the property before March 30 2005, the tax due date." (Def. App. [41-3] at 62). Mr. Miller did not finance the $200,000 or obtain the financing.

Fourth, "[u]ntil the final sale is closed, Don shall pay the mortgage to Jacob Mathew in the amount of $3,390 not later than the 15th of each month." (Def. App. [41-3] at 62). The Dispute Agreement was not recorded.

9

Over the next nearly two and a half years, until about April 2007, the Coriglianos continued to operate the pizza restaurant and made the Mathew contract installment payments. For a month or two after the Dispute Agreement, checks for contract installment payments were written on the L.A.D., Inc. checking account opened by Mr. Miller. After a check bounced, Mr. Mathew insisted on payment in cash. He would go to the restaurant to collect the cash installments from Don Corigliano, who was the only person with whom Mr. Mathew dealt. (Def. App. [41-3] at 31, 49; Pl. App. [42-6] at 109). Whether Mr. Miller or Mr. Corigliano (apparently both were signatories on the account) wrote bad checks is disputed. That checks were bounced, however, is supported by the L.A.D., Inc. December 31, 2004 bank statement. (Pl. App. [42-4] at 40).

On December 6, 2004, the same day as the dispute resolution meeting, Mr. Miller incorporated "L.A.D., Inc." by filing articles of incorporation with the Iowa Secretary of State. Mr. Miller was the sole director of the corporation. The corporation was a wholly new corporation. (Def. App. [41-3] at 64-65).

On December 11, 2004 Mr. Miller presented the Mathews with an affidavit and they signed it. The affidavit reveals that it was prepared by attorney Jason A. Springer of "The Rock Mortgage." Mr. Springer was Mr. Miller's attorney. (Def. App.

[41-3] at 63). In the affidavit the Mathews acknowledged that "L.A.D., Inc.," the named contract buyer in the Mathew contract, had become an inactive corporation. The Coriglianos' L.A.D. Associates, Inc. had in fact been administratively dissolved. Mr. Miller's L.A.D., Inc., which had just been formed, was not dissolved.

The Mathews further acknowledged that L.A.D., Inc. "shall be incorporated as such under different ownership rights and officer designation." (Def. App. [41-3] at 63). The affidavit did not say who the different owners and officers would be. Mr. Mathew has testified Mr. Miller said nothing about becoming an officer or owner of L.A.D., Inc., nor did Mr. Mathew understand that the Coriglianos would no longer have an ownership interest in the company or serve as its officers. (*Id.* at 25-26). As noted above, Mr. Mathew sought and received installment payments from the Coriglianos.

Finally, the Mathews acknowledged in the affidavit that the real estate contract would remain in effect with the new ownership. The stated purpose of the affidavit was to remove "a cloud which may appear on the chain of title" and to affirm the contract. (*Id.*)

In 2004, 2005 and 2006 Mr. Miller prepared year-end draft balance sheets for his L.A.D., Inc. The December 31, 2004 balance sheet did not list the property as a corporate asset.

(Def. App. [41-3] at 77). The December 2005 and 2006 draft balance sheets listed the property as an asset valued at $232,000. (Pl. App. [42-5] at 101-02).

The property taxes became delinquent again. The Coriglianos wanted out of the Mathew contract for the original reasons they had attempted to refinance through Mr. Miller's Iowa Mortgage -- they could not afford the contract and tax payments. For his part, Mr. Mathew wanted to be paid off and settle his obligations under the Scaglione contract as agreed in the Dispute Agreement. The renewed tax delinquency added urgency. Don Corigliano looked for a buyer and found one in his bookkeeper and co-defendant Kevin Goetzl, who owned R & S Xpress, Ltd. Don Corigliano testified the plan was for R & S Xpress to sell the property back to the Coriglianos. That deal did not materialize. The Coriglianos no longer operate the pizza restaurant on the property.

R & S Xpress obtained financing from the Polk County Bank to acquire the property. R & S Xpress executed and delivered to the bank a note in the amount of $215,000 secured by a mortgage on the property. As part of the overall transaction the Scaglione and Mathew contracts were satisfied, a mortgage to secure a line of credit the Coriglianos had obtained was paid, and the delinquent property taxes were paid. (See Def. App. [41-3] at 132). On April 19, 2007 Mr. Scaglione conveyed

the property to the Mathews by warranty deed. On April 26, 2007 the Mathews conveyed the property to "L.A.D., Inc." by warranty deed. On April 13, 2007 "L.A.D., Inc." by Linda Corigliano as President and Andrew Corigliano as Vice President conveyed the property to R & S Xpress, Ltd. by warranty deed. All of these transactions were recorded with the Polk County Recorder.

The principal dispute in this case is whether Mr. Miller through his L.A.D., Inc. purchased the Coriglianos' interest in the property by paying the delinquent taxes under an oral agreement between Mr. Miller and Don Corigliano that Mr. Miller's L.A.D., Inc. would succeed as the buyer under the Mathew contract. Mr. Miller's deposition testimony and affidavit are not entirely consistent on the subject.

In his deposition Mr. Miller testified that the Coriglianos "agreed in exchange for $42,000 [the tax money] to allow L.A.D., Inc. to be reincorporated with myself as owner/officer." (Pl. App. [42-6] at 110). According to Mr. Miller, the fact "L.A.D., Inc." was shown on the Mathew contract as purchaser coupled with his subsequent incorporation of L.A.D., Inc. gave title to his corporation. (*Id.*) Thus Mr. Miller alleges he bought the property for the approximately $42,000 he paid for the tax delinquency. (*Id.* at 114-15). He testified variously, however, that he had permission to "reincorporate" L.A.D., Inc. (presumably from the Coriglianos),

13

(*Id.* at 114) but also that he did not ask any of the Coriglianos if he could reincorporate L.A.D., Inc., and did not have permission from the officers and directors of the Coriglianos' corporation, Linda and Andrew Corigliano, to do so. (Def. App. [41-3] at 73, 76). Mr. Miller also agreed his incorporation L.A.D., Inc. did not "resurrect" the dissolved corporation. (Pl. App. [42-6] at 114).

Mr. Miller never showed L.A.D., Inc.'s articles of incorporation to the Coriglianos, though he testified he showed the Mathew affidavit to the other persons who attended the dispute resolution meeting, which would have included Don Corigliano. (Def. App. [41-3] at 73).

In a 2009 affidavit filed in state court, Mr. Miller stated that after checking with the Iowa Secretary of State's office and confirming "that the existing L.A.D., Inc. had been administratively dissolved," he agreed to provide funds for the delinquent taxes if the Coriglianos agreed to allow him to reincorporate L.A.D., Inc., as sole officer and owner, with his corporation owning the property. (Pl. App. [42-6] at 128). Don Corigliano allegedly consented to this as agent for the Coriglianos' corporation. (*Id.*)

If, as appears to be the case, the Iowa Secretary of State had no record of a L.A.D., Inc. associated with the Coriglianos, Mr. Miller's inquiry should have informed him that

the only L.A.D. corporation established by the Coriglianos was L.A.D., Associates, Inc. In fact Mr. Miller was well aware of L.A.D., Associates, Inc. As the Court understands his testimony, he filled out an application to reinstate L.A.D. Associates and presented it to Linda Corigliano to sign. (Pl. App. [42-6] at 107-08, 114; Def. App. [41-3] at 73-74). Mrs. Corigliano did not sign the second page of the application because, said Mr. Miller, she "wasn't looking for any more paperwork to do." (Def. App. [41-3] at 74). Mr. Miller also testified he filled out the L.A.D. Associates, Inc. reinstatement papers as "a favor to the Coriglianos" but did not file them because he doubted a tax clearance could be obtained and he did not want to get the Coriglianos in trouble. (Pl. App. [42-6] at 108). When just prior to the dispute resolution meeting Mr. Miller asked Mr. Goetzl to provide information about the Coriglianos' gross sales, Mr. Goetzl responded with the "LAD Associates" figures for 2003 and 2004. (Pl. App. [42-5] at 103).

Significantly, Mr. Miller's 2009 affidavit goes on to say that when the signatories and witnesses to the Dispute Agreement gathered to sign it on December 13, 2004 there was a discussion about

> the fact that I would pay the outstanding real estate
> taxes and assume the mortgage on the property by
> financing the agreed-upon purchase price. It was clear
> from our discussions, the Dispute Resolution
> Agreement, and the role I was assuming as sole

shareholder of the New L.A.D., Inc. that I had assumed not only ownership of L.A.D., Inc. but the corporation's real property as well.

(Pl. App. [42-6] at 129). Implicit in this (consistent with the terms of the Dispute Agreement) is that the agreement with Don Corigliano, if there was one, called for Mr. Miller to both pay the real estate taxes and finance the reduced purchase price to obtain ownership of the property.

As to his understanding of the arrangement under which Mr. Miller paid the delinquent property taxes, Don Corigliano testified in his deposition that he knew they were going to have to pay the delinquent tax money back to Mr. Miller, that there was no offer or agreement to sell the property for payment of the delinquent taxes, that the details of what would happen if Mr. Miller financed the $200,000 were unresolved, but when Mr. Miller did not obtain the financing he was out of the picture. (Def. App. [41-3] at 47-49, 51, 54). Mr. Corigliano disclaimed any knowledge about Mr. Miller's incorporation of L.A.D., Inc. and recalled no discussions with Mr. Miller about it. (*Id.* at 60). He testified that early after the Dispute Agreement was finalized he and Mr. Miller agreed that if Mr. Miller paid the Mathew contract installments and restaurant bills Mr. Miller would receive fifteen percent of the restaurant profits, but that arrangement ended when checks written by Mr. Miller for these payments bounced. (Def. App. [41-3] at 49).

16

## II.

### SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the moving party establishes that there are no genuine disputes of material fact, and it is entitled to judgment as a matter of law. *Haigh v. Gelita USA, Inc.*, 632 F.3d 464, 467 (8th Cir. 2011) (citing Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under governing law." *See Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *Teleconnect Co. v. Ensrud*, 55 F.3d 357, 359 (8th Cir. 1995)(quoting *Anderson*, 477 U.S. at 248).

The Court must view all facts and reasonable inferences in the light most favorable to the non-moving party, but it does not resort to speculation. *Hervey v. Cnty. of Koochiching*, 527 F.3d 711, 727 (8th Cir. 2011) (citing *Holland v. Sam's Club*, 487 F.3d 641, 643 (8th Cir. 2007)). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)(quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)). It is paramount that the theory upon which the non-movant relies is plausible. "[I]f the factual context renders [the non-movant's] claim

implausible — if the claim is one that simply makes no economic sense – [the non-movant] must come forward with more persuasive evidence to support than would otherwise be necessary." *Id.* (*see also id.* at 587-88).

## III.

### DISCUSSION

A.   Quiet Title

   1.   *Standard*

     Plaintiff has the burden to establish that title should be quieted in its favor. *State v. Burlington Basket Co.*, 651 N.W.2d 29, 34 (Iowa 2002); *see State v. Simmons*, 290 N.W.2d 589, 592-93 (Iowa 1980). In a quiet title action, there are two presumptions: 1) the party in possession of the property is the owner; and 2) the party with record title is the owner. *Shine v. State*, 458 N.W.2d 864, 866 (Iowa App. 1990).

     Plaintiff L.A.D., Inc. does not have possession or record title as owner. In order to overcome the resulting presumption in favor of the title holder, R & S Xpress, L.A.D., Inc. must provide clear and convincing evidence[9] of ownership. *Shine*, 458 N.W.2d at 866 (citing *Sherbonday v. Surring*, 194 Iowa 203, 214, 188 N.W. 831, 835 (1922); *Jeffrey v. Grosvenor*, 261

---

[9]   The clear and convincing evidence standard in Iowa requires proof by more than a preponderance of the evidence; there must be "no serious or substantial doubt about the correctness of the conclusion to be drawn from it." *Raim v. Stancel*, 339 N.W.2d 621, 624 (Iowa App. 1983).

Iowa 1052, 1062-63, 157 N.W.2d 114, 122 (1968)). Viewing the evidence in the light most favorable to L.A.D., Inc. it must be possible for a factfinder to conclude on the strength of its claim (not on the weakness of a defendant's claim), *Burlington Basket Co.*, 651 N.W.2d at 34 (citing *Simmons* 290 N.W.2d at 592), there is clear and convincing evidence L.A.D., Inc. is the rightful owner. *See Bienak v. Romstad*, No. 5-457/05-0432, 2006 Iowa App. LEXIS 563, at *13-15 (Iowa App. July 27, 2006). Similarly, when an alleged oral agreement is relied on to quiet title "the evidence of the alleged oral agreement must be so cogent, clear and forcible as to leave no reasonable doubt in chancellor's mind as to its terms and character." *Mack v. Linge*, 254 Iowa 963, 969, 119 N.W.2d 897, 900 (1963); *see Russell v. Rasmussen*, No. 00-1763, 2002 WL 180421, at *1 (Iowa App. Feb. 6, 2002).

    2.   *Application*

       Preliminarily a brief discussion about the identity of the Mathew contract buyer at the time of the contract's formation and the authority of an administratively dissolved corporation to convey the property is in order. The only record the Court has before it of a L.A.D. corporate entity ever associated with the Coriglianos is L.A.D. Associates, Inc. The parties to the Mathew contract clearly intended the buyer would be a corporation established by the Coriglianos. If there was no

Corigliano L.A.D., Inc., the Coriglianos must have incorporated L.A.D. Associates, Inc. to buy the property, albeit a few weeks after the contract was entered into. In that event the identity of "L.A.D., Inc." as the corporate buyer in the Mathew contract was a misnomer of L.A.D. Associates, Inc. L.A.D. Associates, Inc. then was the buyer. The misnomer of a corporation in an instrument is not material if the identity of the corporation is reasonably clear or ascertainable. Here that would be the case because of the similarity in the corporate names, the corporate signatures and address on the Mathew contract. See Kelly v. Hard Money Funding, Inc., 2004 UT App. 44, 87 P.3d 734, 740 (Utah 2004)(quoting 18A Am.Jur.2d Corporations § 286 (1985)(now found at *id.* § 238 (2004 ed.) on corporate misnomers in instruments); 6 William Meade Fletcher, Fletcher Cyclopedia of the Law of Corporations § 2444 at 169 (2013 rev. ed.)(citing cases from a variety of jurisdictions including Iowa: *Hickman v. Hygrade Packing Co.*, 185 N.W.2d 801, 803 (Iowa 1971)(holding that a misnomer in a notice to a corporation may be substantial (fatal) or insubstantial (non-fatal))).

L.A.D. Associates, Inc. was administratively dissolved in August 2002. As noted, Mr. Miller contends there was also a L.A.D., Inc. that had been dissolved. Dissolution does not end corporate existence. "A corporation administratively dissolved continues its corporate existence but shall not carry on any

business except that necessary to wind up and liquidate its business and affairs under section 490.1405 . . . ." Iowa Code § 490.1421(3). Section 490.1405 permits a dissolved corporation to dispose of property and discharge its liabilities in winding up its affairs. *Id.* § 490.1405(1)(b),(c). A dissolution does not transfer the corporation's property. *Id.* § 490.1405(2)(a). The dissolution of L.A.D. Associates, Inc. (or L.A.D., Inc. if there was one) did not affect its obligations or ownership interest under the Mathew contract. It could wind up its affairs by completing the sale of its principal asset and in the course of doing so discharging its obligations under the Mathew contract and disposing of the property by conveyance to R & S Xpress Ltd.

Turning to the merits, when asked in his deposition what documents supported his claims, Mr. Miller identified the Mathew contract, the articles of incorporation of L.A.D., Inc., the Miller affidavit and the Dispute Agreement. (Def. App. [41-3] at 74-76). These documents, neither individually nor collectively, conveyed or assigned an ownership interest in the property to Mr. Miller or his corporation.

For reasons stated previously, the contract buyer under the Mathew contract would appear to have been L.A.D. Associates, Inc. and L.A.D., Inc. was a misnomer. In any event, the L.A.D., Inc. later incorporated by Mr. Miller did not exist

when the contract was entered into and Mr. Miller had nothing to do with the formation of the contract.

The articles of incorporation of Mr. Miller's corporation did not create any ownership interest in the property. Merely forming a corporation with the same name as a corporate misnomer or a dissolved corporation named in an existing contract does not give the new corporation an interest in the contract to which it was not a party. The linchpin of plaintiff's argument is that Mr. Miller's incorporation of L.A.D., Inc. was an agreed "reincorporation" of the Coriglianos' corporation which resulted in Mr. Miller's corporation assuming the Coriglianos' ownership rights under the contract. The problem with this is that L.A.D., Inc. incorporated by Mr. Miller was a wholly new corporation, not a reincorporation[10] of any corporation owned by the Coriglianos. As a separate legal entity the Coriglianos' corporation, though dissolved, retained rights of ownership and possession under the Mathew contract.

The Mathew affidavit prepared by Mr. Miller's lawyer is signed only by the Mathews. It merely acknowledges the corporate buyer under the contract was "inactive," that L.A.D., Inc. would be incorporated under different ownership and officers, and that the contract would continue under the new

---

[10] Under the Iowa Business Corporation Act an administratively dissolved corporation may apply to be "reinstated" but there is no such thing as a "reincorporation" of a dissolved corporation. *See* Iowa Code § 490.1422.

ownership as buyers. It does not say who the new ownership would be, that the Coriglianos would not be included, or that Mr. Miller would be the new corporate owner. As a mere acknowledgment by the sellers, it did not affect the property rights of the Coriglianos or their corporation.

Lastly, the Dispute Agreement does not establish any rights of Mr. Miller's L.A.D., Inc. in the property. To the contrary, it identifies Mr. Miller as a witness, not a party. It is an agreement between the Coriglianos and the Mathews to complete the sale of the property at a reduced price with arrangements to pay tax and installment deficiencies. Mr. Corigliano agreed to pay the delinquent property tax and mortgage payments, with Mr. Miller making the delinquent property tax payment to Mr. Mathew "for Don . . . ." The agreement contemplates Mr. Miller would finance the $200,000 reduced sale price within three months. Until the property was sold Mr. Corigliano agreed to make the installment payments to Mr. Mathew in the amount of $3,390 a month, which, with a few exceptions, the Coriglianos paid over the next two years. The Dispute Agreement is clear that the Coriglianos retained the buyer's payment obligations to the Mathews. The Dispute Agreement makes no mention of L.A.D. Associates, Inc. or L.A.D., Inc. It says nothing about the formation of a new corporate

entity to become the buyer under the contract, or that Mr. Miller directly or through a corporation would become the buyer.

No documents evince a conveyance or assignment of an ownership interest in the property to Mr. Miller's L.A.D., Inc. It is difficult to believe if there was an agreement between Mr. Miller and Don Corigliano that Mr. Miller purchased the Coriglianos' interest in the property by forming L.A.D., Inc. and paying delinquent taxes that there would not be a written agreement documenting the transfer of interest.

To generate a genuine issue of material fact the claim that Mr. Miller's corporation purchased the property by paying the delinquent taxes depends on the sufficiency of Mr. Miller's testimony about his oral agreement with Mr. Corigliano. It is implausible that the Coriglianos would sell their contract interest in property valued at about $250,000 for $42,794 while obligating themselves under the Dispute Agreement to make installment payments on the Mathew contract indefinitely if Mr. Miller's financing did not materialize. If Mr. Miller acquired the Coriglianos' interest by paying the delinquent taxes there would have been no incentive for him to obtain the financing as long as the Coriglianos were making the payments. One does not ordinarily sell an entire interest in property but retain the obligation to pay for it. Under the plaintiff's theory, if the Coriglianos continued to make installment payments until the

24

contract was paid off, Mr. Miller's L.A.D., Inc., not the Coriglianos' corporation, would obtain clear title even though the Coriglianos had paid many times more than the delinquent tax payment. The arrangement makes no economic sense. There is no persuasive evidence to support it. Mr. Miller's testimony in this regard does not generate a genuine issue of material fact. *See Matsushita Elec.*, 475 U.S. at 587.

Beyond a brief initial period, Mr. Miller's L.A.D., Inc. did not act as it were the buyer following the Dispute Agreement. It did not make the installment payments. It did not pay taxes. It did not make any attempt to cure the property tax delinquency. The latter was an immediate problem in 2007. The title opinion for the sale to R & S Xpress reveals that the property had been sold at tax sale, the initial redemption period had run and title was at risk of vesting in the tax sale buyer in the near future. (Def. App. [41-3] at 133). Mr. Miller testified in his deposition that he was aware the property taxes had not been paid, was concerned the property was going to be sold at tax sale, had not taken any steps to pay the delinquency or find a buyer, and was not in a position to avoid the tax sale. (*Id.* at 70). Had the property not been redeemed, any interest of L.A.D., Inc. as well as everyone else's would have been lost.

What is plausible, though disputed, is that Mr. Miller and Don Corigliano had an understanding that if Mr. Miller paid the delinquent taxes and financed the sale of the property in the near term as Mr. Miller said he would do, the property would be conveyed to Mr. Miller's "L.A.D., Inc." Any alleged agreement between Mr. Miller and Mr. Corigliano concerning ownership of the property must be seen in light of the Dispute Agreement which, as Mr. Miller himself has testified, would have been part of the overall deal. Again, in his 2009 affidavit Mr. Miller stated that the discussion when the Dispute Agreement was signed was "that I would pay the outstanding real estate taxes and assume the mortgage on the property by financing the agreed-upon purchase price" with "New L.A.D., Inc." emerging from the transaction as property owner. (Pl. App. [42-6] at 129). Financing was to be obtained and the sale concluded by March 30, 2005. Even if the deal was along these lines, Mr. Miller's corporation did not acquire ownership of the property because Mr. Miller did not finance the sale.

Taking the record as a whole, the Court concludes a factfinder could not find that title to the property should be quieted in plaintiff's favor. There is no clear and convincing evidence that plaintiff owns the property. The evidence of the oral agreement on which plaintiff relies is not sufficiently cogent or clear to be given effect. There is no genuine issue

for trial, and FDIC-R is entitled to summary judgment on the quiet title claim.

B.   Bona Fide Purchaser

        While the FDIC-R is entitled to summary judgment on plaintiff's quiet title action, in the context of a report and recommendation it is appropriate to address briefly the FDIC-R's affirmative defense that it was a bona fide purchaser without notice of plaintiff's claimed interest.

    1.   *Standard*

        The bona fide purchaser ("BFP") rule applies to traditional buyers, as well as mortgagees who gain a security interest in property by providing the funds to purchase it. *Raub v. General Income Sponsors of Iowa, Inc.*, 176 N.W.2d 216, 219 (Iowa 1970)(citing *Brundson v. Brundson*, 199 Iowa 1099, 1112, 200 N.W. 823, 829 (1924)). The general rule is that the BFP's interest in the property is protected against adverse claims by the true owner if it neither knew nor should have known about adverse claims made against the alleged grantor. "A bona fide purchaser is one who takes a conveyance of real estate in good faith from the holder of legal title, paying a valuable consideration for it without notice of outstanding equities." *Id.* (citing *Bell v. Pierschbacher*, 245 Iowa 436, 449, 62 N.W.2d 784, 792 (1954)). If a purchaser has notice, its interest is not protected.

A purchaser may have constructive or actual notice of adverse claims. *Sun Valley Iowa Lake Ass'n v. Anderson*, 551 N.W.2d 621, 637 (Iowa 1996). A purchaser may have constructive notice if the interest is recorded at the county recorder's office in compliance with the recording statute. *Id.* Actual notice includes both actual knowledge and knowledge that the purchaser would have acquired had it inquired. *Id.* (citing *Nat'l Props. Corp. v. Polk Cnty.*, 351 N.W.2d 509, 511 (Iowa 1984)). A purchaser may be on inquiry notice if it would have known of adverse claims against the grantor if it had investigated properly. *Id.* A purchaser is only on inquiry notice if 1) based on the circumstances, a reasonably prudent person, exercising ordinary diligence would have investigated; and 2) it would have discovered adverse claims. *Id.* at 637-38 (quoting *Raub*, 176 N.W.2d 216 at 220); *see also Scaglione v. Lamar Co.*, 741 N.W.2d 824, No. 06-1436, 2007 WL 2964382, at *2 (Iowa App. 2007)(citing *Nat'l Props. Corp.*, 351 N.W.2d at 511)). In such a case, the law charges the purchaser with knowing all that the investigation would have revealed. *Sun Valley Iowa Lake Ass'n*, 551 N.W.2d at 637-38 (quoting *Raub*, 176 N.W.2d at 220). If the results revealed adverse claims, the purchaser could not receive the protections afforded to a BFP. *Id.* at 638.

2.   *Application*

The issue is not whether the bank had constructive notice or actually knew plaintiff had an adverse claim. Nothing was recorded with the Polk County Recorder which would have given notice, and there is no evidence of actual notice. Rather, the question is whether there is sufficient evidence to generate a genuine issue of fact about whether the bank was on inquiry notice.

Plaintiff puts forth many reasons why the bank was on inquiry notice. All but one of these are unrelated to the state of the title or the discovery of a potentially adverse claim by Mr. Miller's L.A.D., Inc. One particular piece of evidence, however, gives pause. A bank document concerning the R & S Xpress loan request reveals that one of the bank's employees checked with the Secretary of State's office and could not find a listing for "L.A.D., Inc." (Pl. App. [42-4] at 83). The Secretary of State's records should have revealed that Mr. Miller was the sole officer and director of the corporation. Since the same document also appears to reflect the bank's belief that Don Corigliano was the owner of the L.A.D., Inc. identified as the buyer in the Mathew contract, had the bank learned of Mr. Miller's involvement it would have raised a question about Mr. Corigliano's authority. The notations about L.A.D., Inc. in the bank's records raise unanswered questions.

Was the person who wrote the note being truthful? How is it a check of the Secretary of State's records would fail to locate a record of L.A.D., Inc.? Was the record check properly performed; was it attempted more than once? Did the inability to find a record of the corporation itself raise a question about L.A.D., Inc.'s ability to convey good title requiring further inquiry?

The Court is informed the bank employees involved in approving the loan are long gone and their depositions have not been taken. The FDIC-R standing in the shoes of the bank has both the burden of proof on its defense and the burden to demonstrate the absence of a genuine issue of material fact. Viewed favorably to plaintiff the unexplained notations in the bank document raise an arguable inference that verifying the status and ownership of L.A.D., Inc. as seller to the borrower was part of a prudent investigation a bank lender would undertake. Had that been done the adverse claim of Mr. Miller's corporation may have been revealed. The result is a genuine issue of material fact about whether the bank was on inquiry notice. Summary judgment cannot be granted on the bank's BFP claim.

C.   <u>Common Law Attorney Fees for FDIC-R</u>

The FDIC-R seeks summary judgment on its counterclaim for common law attorney fees. An award of common law attorney fees is only appropriate against a party that has acted in "bad

faith, vexatiously, wantonly or for oppressive reasons." *Hockenberg Equip. Co. v. Hockenberg's Equip. & Supply Co. of Des Moines, Inc.*, 510 N.W.2d 153, 158 (Iowa 1993). To warrant common law attorney fees the opponent's conduct "must rise to the level of oppression or connivance to harass or injure another." *Id.* at 159-60. Intentional conduct "likely to be aggravated by cruel and tyrannical motive" is what common law attorney fees are about. *Id.; see Williams v. Van Sickel*, 659 N.W.2d 572, 579 (Iowa 2003)(citing *Hockenberg Equip.*). As this difficult standard implies, common law attorney fees are a rare exception to the general rule that attorney fees may be awarded only if provided for by statute or contract, reserved for extreme cases of litigious abuse going "far beyond 'mere lack of care' or 'disregard for the rights of another.'" *Hockenberg Equip.*, 510 N.W.2d at 159. Courts must take care to confine common law attorney fees to their proper boundary, lest the exception swallow the rule.

FDIC-R asserts this standard is met because 1) plaintiff has pursued this case for six years against a defendant who is now bankrupt (the bank), 2) despite not having record title or corroborating testimony, and 3) while suing former attorney Springer for malpractice for his failure to properly advise on this matter. Plaintiff is not responsible for prolonging the litigation. Bankruptcies, stay orders, and the

substitution of the FDIC-R are chiefly responsible. That the bank has failed is no proof of abuse in continuing to sue it. Regardless of the bank's fortunes the bank because of its interest in the property must be named and pursued as a defendant to the quiet title action. It is true that the quiet title action is dependent on Mr. Miller's testimony. On its face the quiet title claim is doubtful because of the lack of possession, title or documentation, but plaintiff's claim is not so far out of bounds as to be fairly characterized as an oppression or connivance to harass or injure the bank or FDIC-R. Hockenberg, 510 N.W.2d at 159-60. Plaintiff has not sued for an improper purpose. Finally, given the facts of this case it is not surprising that Mr. Miller has sued his former attorney for alleged failure to advise him of the need to document and record the alleged acquisition of the Coriglianos' L.A.D. corporation by Mr. Miller's L.A.D., Inc. The two actions are not mutually exclusive, indeed, the attorney fees for prosecuting the quiet title action are an element of damages for the alleged legal malpractice. (Def. App. [41-3] at 87).

The FDIC-R's motion for summary judgment on its counterclaim for common law attorney fees should be denied. Plaintiff has not moved for summary judgment on the issue, thus the claim remains nominally in the case. Because the fee claim is not an element of any damages claimed by the FDIC-R it is

appropriately presented by motion rather than counterclaim. Fed. R. Civ. P. 54(d)(2)(A). *See Hockenberg Equip.*, 510 N.W.2d at 159 (under state procedure common law attorney fees are an equitable matter to be determined by the court on motion). If FDIC-R is intent on pursuing its claim for common law attorney fees it shall within the time provided for objection to this report and recommendation file a motion for such fees with any further supporting argument it wishes to make. *See* Fed. R. Civ. P. 54(d)(2)(B)(court by order may provide for timing and contents of attorney fee motion). Plaintiff may have the time provided in the local rules for response. The undersigned will recommend that any such motion be denied for the reasons given. In filing its motion the FDIC-R need not present an itemized statement of the amount claimed as required by LR 54.1.a. If the motion is granted the Court will allow sufficient time for submission of the itemization and any response to it by plaintiff.

## IV.

### CONCLUSIONS, RECOMMENDATIONS AND ORDERS

The FDIC-R's motion for summary judgment on the quiet title claim in Count I of the Amended Petition should be granted. In view of this recommendation, it is not necessary to address the other issues raised by the FDIC-R in its motion: fees and costs a prevailing plaintiff may recover under the quiet title statute (Iowa Code ch. 649) and the FDIC-R's

alternative claim in its Counterclaim I for an equitable mortgage or lien. Counterclaim I is moot. As discussed above, the FDIC-R's Counterclaim II for common law attorney fees will be presented by motion if the FDIC-R wishes to proceed with the claim.

The state claims against the other defendants remain. With the dismissal of the quiet title claim the Court will have resolved the only claim over which it has original jurisdiction. That raises the question of whether the Court should continue to exercise supplemental jurisdiction over the claims against the other defendants. 28 U.S.C. § 1367(c). The undersigned will recommend that the Court decline to exercise supplemental jurisdiction and that the claims be remanded to state court. See *Carlsbad Tech, Inc. v. HIF BIO, Inc.*, 556 U.S. 635, 641 (2009)(involving remand after declining to exercise supplemental jurisdiction); *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 357 (1988)(holding district court has discretion to remand pendent state claims upon declining to retain jurisdiction).

As noted previously, the claims against the other defendants appear to be subject to a pre-removal stay order in state court. The state law claims against the other defendants have accordingly not progressed in this Court. Proceedings here have concerned only the quiet title action. Time and effort will not have been wasted by returning the remaining claims to state

court. Apparently all of the other defendants have at one time or another sought bankruptcy protection, but whether all obtained discharge is unclear. All the claims and counterclaims in this case are based on state law. There is no federal law claim. The case is in this Court only because of the FDIC-R's statutory authority to bring it here. The remaining state law claims are numerous, and if not precluded by dismissal of the quiet title claim or bankruptcy discharge, raise many substantive state law and damages issues. Considerations of judicial economy, convenience, fairness and comity make declining to further exercise supplemental jurisdiction the appropriate course. In view of the length of time the case has been pending, remand rather than dismissal without prejudice is preferable so that plaintiff, if it wishes to pursue the claims, is not faced with beginning the case anew.

In consideration of the foregoing IT IS RESPECTFULLY RECOMMENDED that FDIC-R's motion for partial summary judgment [41] be granted in part and denied in part as follows, with proceedings as indicated:

1. That the FDIC-R's motion for summary judgment [41] on plaintiff's quiet title claim in Count I of the Amended Petition be granted and that Count I be dismissed.

2. That the FDIC-R's motion for summary judgment on its Counterclaim I be denied as moot.

3.   That the FDIC-R's motion for summary judgment on its Counterclaim II for common law attorney fees be denied. If the FDIC-R wishes to pursue its claim for common law attorney fees it shall within the time provided below for objection file a fee motion as discussed above. If such a motion is filed, plaintiff may have the time provided in the local rules for response. Based on the discussion above, if a fee motion is filed it should be denied and Counterclaim II dismissed. If a fee motion is not filed, Counterclaim II should be dismissed as abandoned. Unless further hearing is requested on any such motion, the Court will determine the fee motion on the basis of the motion papers.

4.   That the Court decline to continue to exercise supplemental jurisdiction over the remaining claims against the other defendants, Counts II-VIII inclusive in the Amended Petition, and that those claims be remanded to the Iowa District Court in and for Polk County, Iowa.

IT IS ORDERED that the parties have until **February 27, 2014** to file written objections to the Report and Recommendation, pursuant to 28 U.S.C. § 636(b)(1). *Thompson v. Nix*, 897 F.2d 356, 357 (8th Cir. 1990); *Wade for Robinson v. Callahan*, 976 F. Supp. 1269, 1276 (E.D. Mo. 1997). Any objections filed must identify the specific portions of the Report and Recommendation and relevant portions of the record to

which the objections are made and must set forth the basis for such objections. *See* Fed. R. Civ. P. 72; *Thompson*, 897 F.2d at 357. Failure to timely file objections may constitute a waiver of a party's right to appeal questions of fact. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Griffini v. Mitchell*, 31 F.3d 690, 692 (8th Cir. 1994); *Halpin v. Shalala*, 999 F.2d 342, 345 & n.1, 346 (8th Cir. 1993); *Thompson*, 897 F.2d at 357.

IT IS SO ORDERED.

Dated this 7th day of February, 2014.

_____
ROSS A. WALTERS
UNITED STATES MAGISTRATE JUDGE